# No. 14-1310

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

### TERRY L. ELLIS; SHEILA K. ELLIS,

Petitioners-Appellants

v.

### COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee

### ON APPEAL FROM THE DECISION OF
### THE UNITED STATES TAX COURT

### BRIEF FOR THE APPELLEE

TAMARA W. ASHFORD
  *Acting Assistant Attorney General*

RICHARD FARBER          (202) 514-2959
JOHN A. NOLET           (202) 514-2935
  *Attorneys, Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

11568703.1

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Terry L. and Sheila K. Ellis (taxpayers) appeal the determination of the Tax Court that in 2005 Mr. Ellis engaged in a prohibited transaction under Internal Revenue Code § 4975(c)(1) with respect to his Individual Retirement Account (IRA), resulting in the IRA being treated as fully distributed in 2005 and includible in taxpayers' gross income in that year. Mr. Ellis, in 2005, directed his IRA to acquire nearly all of the equity interests in a used car company which paid him compensation as general manager and also paid rent for the lease of real property from an entity wholly owned by the Ellises and their children. The Tax Court held that these events resulted in a prohibited transaction within the meaning of § 4975(c)(1).

Pursuant to Eighth Circuit Rule 28A(i)(1), counsel for the Commissioner respectfully inform the Court that they believe oral argument would be helpful to the Court in resolving this appeal, and suggest that 15 minutes per side be allowed for oral argument.

11568703.1

# TABLE OF CONTENTS

**Page**

Summary of the case and Request for oral argument .............................. i

Table of contents ................................................................................. ii

Table of authorities .............................................................................. iv

Jurisdictional statement ....................................................................... 1

Statement of the issue ........................................................................... 3

Statement of the case ............................................................................ 3

    A.    Course of the proceedings and disposition in the court below ................................................................. 3

    B.    Statement of the facts .................................................. 4

        1.    Background ......................................................... 4

            a.    Mr. Ellis's formation of CST Investments, LLC, and CDJ, LLC .............. 4

            b.    Mr. Ellis's rollover of his employee retirement account to a traditional IRA, and his IRA's acquisition of membership units in CST ........................... 7

        2.    Relevant CST and CDJ transactions during 2005 and 2006, and the tax returns filed by CST, CDJ, and the Ellises for those years .......... 8

        3.    The Commissioner's notice of deficiency and the Tax Court proceedings commenced by taxpayers ........................................................ 10

Summary of Argument ........................................................................ 20

11568703.1

**Page**

Argument ................................................................... 25

      The Tax Court correctly held that during 2005 Mr. Ellis engaged in a prohibited transaction under I.R.C. § 4975(c)(1) with respect to his IRA, with the result that the IRA ceased to be exempt from tax in 2005 and its assets are deemed to be fully distributed to him as of the first day of that year ................................... 25

      Standard of review ............................................. 25

    A.    Introduction ................................................ 25

    B.    Under I.R.C. § 4975(e)(2) and (3), Mr. Ellis was a fiduciary and disqualified person, and CST, CDJ and Mr. Ellis's spouse and children were disqualified persons ..................................... 30

    C.    A prohibited transaction within the meaning of I.R.C. § 4975(c)(1) occurred when Mr. Ellis directed his IRA to acquire a 98-percent interest in CST in 2005, because the investment was part of an arrangement or understanding under which it was expected that CST would make payments of compensation to Mr. Ellis and payments of rent to CDJ ............................................................ 32

        1.    Irrespective of the plan-assets regulation, Mr. Ellis's self-directed investment of his IRA's assets in CST resulted in prohibited self-dealing with his IRA under I.R.C. § 4975(c)(1)(D) and (E) ........................................ 33

        2.    The Tax Court's holding in this case is consistent with the above analysis and with § 4975(c)(1)'s prohibition on Mr. Ellis's "indirect" self-dealing with his IRA ................... 41

11568703.1

Page(s)

3. Taxpayers' reliance on the Tax Court's decisions in *Swanson* and *Hellweg* is misplaced............................................................45

4. The exemptions in I.R.C. § 4975(d)(2) and (d)(10) are inapplicable to this case..................48

Conclusion ...........................................................................................54
Certificate of compliance .....................................................................55
Certificate of service ............................................................................56

## TABLE OF AUTHORITIES

**Cases:**

*Baizer v. Commissioner*, 204 F.3d 1231 (9th Cir. 2000)...............25
*Benefits Committee of Saint-Gobain Corp. v. Key*
      *Trust Co. of Ohio, N.A.*, 313 F.3d 919 (6th Cir. 2002)..........27
*Chevron U.S.A., Inc. v. Natural Resources Defense*
      *Council, Inc.*, 467 U.S. 837 (1984) ........................................27
*Commissioner v. Keystone Consol. Indus., Inc.*,
      508 U.S. 152 (1993) ........................................................26, 43
*Flahertys Arden Bowl, Inc. v. Commissioner*,
      115 T.C. 269 (2000), .............................................27, 28, 30
*Halabi v. Ashcroft*, 316 F.3d 807 (8th Cir. 2003)...........................53
*Harris Trust and Sav. Bank v. John Hancock Mut.*
      *Life Ins. Co.*, 302 F.3d 18 (2d Cir. 2002) ...............................50
*Hellweg v. Commissioner*, T.C. Memo. 2011-58,
      2011 WL 821090 (U.S. Tax Ct. 2011) ......................45, 47, 48
*Janpol v. Commissioner*, 101 T.C. 518 (1993) ...............................27
*Leib v. Commissioner*, 88 T.C. 1474 (1987) ...................................29
*Lowen v. Tower Asset Management, Inc.*,
      829 F.2d 1209 (2d Cir. 1987)............................................44, 49
*Musco Sports Lighting, Inc. v. Commissioner*,
      943 F.2d 906 (8th Cir. 1991) ...................................................25
*National Sec. Systems, Inc. v. Iola*, 700 F.3d 65 (3d Cir. 2012) ....50
*O'Malley v. Commissioner*, 96 T.C . 644(1991),............................44
*Peek v. Commissioner*, 140 T.C. 216 (2013) ..................................44

11568703.1

**Cases (continued):**                                                 **Page(s)**

*Rollins v. Commissioner*, T.C. Memo. 2004-260,
2004 WL 2580602 (U.S. Tax Ct. 2004) ................................. 44
*Rutland v. Commissioner*, 89 T.C. 1137 (1987) ............................ 28
*Swanson v. Commissioner*, 106 T.C. 76 (1976)................. 19, 45, 46
*Westoak Realty and Inv. Co., Inc. v. Commissioner*,
999 F.2d 308 (8th Cir. 1993) ................................................. 29

**Statutes:**

29 U.S.C.:

§ 1001.................................................................................25
§ 1106.................................................................................25

Employee Retirement Income and Security Act
of 1974, Pub. L. 93-406, 88 Stat. 829 ................................3, 25

§ 408(b)(2) ................................................................51, 52, 53
§ 408(c)(2) .........................................................................53

Internal Revenue Code (26 U.S.C.):

§ 61(a) ...............................................................................29
§ 72(t)..................................................................12, 13, 16
20, 30, 53
§ 72(t)(2)(A)(i) ....................................................................30
§ 267(c)........................................................................31, 46
§ 267(c)(4) ..........................................................................31
§ 401(k) .........................................................................7, 12
§ 408.....................................................................................3
§ 408(a) .........................................................................7, 21, 26
§ 408(e)(1) ..........................................................................53
§ 408(e)(2) ..........................................................................29
§ 408(e)(2)(A) ....................................................................11
§ 408(e)(2)(B) ....................................................................11
§ 4973..................................................................................48

11568703.1

**Statutes (continued):**            **Page(s)**

§ 4975..................................................................3, 11, 15
25, 26, 27
29, 33
§ 4975(c)..................................................................12
§ 4975(c)(1) ..........................................................i, iii, 3
20, 22, 23
25, 26, 29
32, 42, 48
§ 4975(c)(1)(A) ..................................................26, 40, 45
§ 4975(c)(1)(D) ..................................................iii, 26, 33
36, 39, 41
45, 46
§ 4975(c)(1)(E) ..................................................26, 33, 34
40, 53
§ 4975(d)(2)..........................................................iv, 13, 15
23, 24, 48
51, 52, 53
§ 4975(d)(10) ........................................................49, 53
§ 4975(e) ...............................................................22
§ 4975(e)(1)(B) .....................................................26
§ 4975(e)(2) ..........................................................iii, 30
§ 4975(e)(2)(A) .....................................................27, 30
§ 4975(e)(2)(B) .....................................................28
§ 4975(e)(2)(F) .....................................................28, 32
§ 4975(e)(2)(G) .....................................................28, 31, 46
§ 4975(e)(3) ..........................................................27
§ 4975(e)(5) ..........................................................31
§ 4975(e)(6) ..........................................................31, 32
§ 6110(k)(3) ..........................................................47
§ 6213(a) ..............................................................2
§ 6651(a)(1) ..........................................................1, 11
§ 6662..................................................................53
§ 6662(a) ..............................................................1, 4, 11
§ 7482(a)(1) ..........................................................2
§ 7483..................................................................2
§ 7502(a) ..............................................................2

11568703.1

**Miscellaneous:** **Page(s)**

29 C.F.R.:

§ 2509.75-2 ..................................................... 3, 23, 33
34, 35
§ 2509.75-2(c) .................................................. 22, 34, 39
40, 41, 42
46
§ 2510.3-101 ................................................... 13, 32, 34
§ 2510.3-101(a)(2)(i) .................................... 15, 22, 32
§ 2550.408c-2 ................................................... 50, 51
§ 2550.408b-2(b) .................................................. 52
§ 2550.408c-2(a) .............................................. 51, 53

DOL Advisory Opinions:

No. 75-103 ....................................................... 15, 34
No. 2000-10A ................................................... 27, 37
No. 2006-01A .............................................. 28, 34, 36
No. 2011-04A .............................................. 34, 36

DOL Advisory Opinion Procedure, 41 F.R. 36281 ........................ 27

DOL Interpretitive Bulletin 75-2 ...................... 3, 15, 22
23, 46

DOL Opinion Letter No. 83-45A ............................ 50, 51

Federal Rules of Appellate Procedure:

Rule 13(a) ................................................................. 2

H. Conf. Rept. No. 93-1280 (1974), 1974-3 C.B. 415 ..................... 43

H.R. Rep. No. 93-807 (1974), 1974-3 C.B. (Supp.) 236 ................. 29

**Miscellaneous (continued):** **Page(s)**

IRS Field Service Advisory 200128011...........................................47

Presidential Reorganization Plan No. 4 of 1978, 5 U.S.C. app.
  at 214, 43 FR 47713 (October 17, 1978) .........................15, 26

S. Rep. No. 93-383 (1974), 1974-3 C.B. (Supp.) 80 ........................28

11568703.1

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

─────────────

## No. 14-1310

## TERRY L. ELLIS; SHEILA K. ELLIS,

### Petitioners-Appellants

### v.

## COMMISSIONER OF INTERNAL REVENUE,

### Respondent-Appellee

─────────────

## ON APPEAL FROM THE DECISION OF
## THE UNITED STATES TAX COURT

─────────────

## BRIEF FOR THE APPELLEE

─────────────

## JURISDICTIONAL STATEMENT

On March 28, 2011, the Commissioner of Internal Revenue mailed

a notice of deficiency to Terry L Ellis and Sheila K. Ellis (taxpayers)

pursuant to § 6212 of the Internal Revenue Code of 1986 (26 U.S.C.)

(hereafter, I.R.C. or the Code).  In that notice, the Commissioner

determined a deficiency in taxpayers' 2005 income tax, together with an

accuracy-related penalty under I.R.C. § 6662(a), or alternatively, a

deficiency in their 2006 income tax, together with an accuracy-related

penalty under I.R.C. § 6662(a), and a late-filing penalty under I.R.C.

11568703.1

§ 6651(a)(1). (A. 94-109.)[1] On June 1, 2011, within 90 days of the mailing of the notice of deficiency, *see* I.R.C. § 6213(a), taxpayers timely filed a petition in the United States Tax Court, contesting the Commissioner's determinations. (Doc. 1; Doc. 3, Amended Pet.) The Tax Court had jurisdiction under I.R.C. §§ 6213(a), 6214, and 7442.

On October 30, 2013, the Tax Court entered a decision that taxpayers are liable for a 2005 tax deficiency of $135,936 and an accuracy-related penalty of $27,187. (A. 531.) Taxpayers filed a notice of appeal, which was received by the Tax Court on February 3, 2014, but mailed in an envelope bearing a United States postmark of January 28, 2014. Because it was mailed on the 90th day after the entry of the Tax Court's decision, the notice of appeal is deemed timely. (A. 533, 535.) *See* I.R.C. §§ 7483, 7502(a); Fed. R. App. P. 13(a). This Court has jurisdiction under I.R.C. § 7482(a)(1).

---

[1] "A." references are to the record appendix filed by taxpayers. "Doc." references are to the documents in the original record on appeal as numbered by the Clerk of the Tax Court.

## STATEMENT OF THE ISSUE

Whether the Tax Court correctly held that during 2005 Mr. Ellis engaged in a prohibited transaction under I.R.C. § 4975(c)(1) with respect to his IRA, with the result that the IRA ceased to be exempt from tax and was deemed fully distributed to him as of the first day of that year.

The most apposite authorities are:

Employee Retirement Income and Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 829.

I.R.C. § 4975.

I.R.C. § 408.

Department of Labor Interpretative Bulletin 75-2, 29 C.F.R. § 2509.75-2.

## STATEMENT OF THE CASE

### A.    Course of the proceedings and disposition in the court below

Taxpayers filed a petition in the Tax Court contesting the Commissioner's determination that there was a deficiency in their 2005 income tax, or, alternatively, in their 2006 tax and that they were liable for an addition to tax and certain penalties.  (Doc. 1; Doc. 3, Amended

Pet.)  On a fully stipulated record, the Tax Court rendered its opinion that taxpayers are liable for a deficiency in income tax of $135,936 for 2005 and an accuracy-related penalty of $27,187 for that year.[2]  (A. 504-530.)  The court accordingly entered a decision for the Commissioner for that year (A. 531), and taxpayers now appeal (A. 533).[3]

## B.  Statement of the facts

### 1.  Background

#### a.  Mr. Ellis's formation of CST Investments, LLC, and CDJ, LLC

In April 2005, Mr. Ellis engaged a law firm to advise him on the options available for restructuring his business and investment holdings.  (A. 5, ¶ 12; A. 111-112.)  On or about May 25, 2005, an attorney from that firm representing Mr. Ellis formed a Missouri

---

[2] The Tax Court's decision to uphold the I.R.C. § 6662(a) penalty asserted by the Commissioner for 2005 was based on taxpayers' concession in the parties' stipulation of settled issues that they "have not provided sufficient evidence and have not otherwise proven reasonable cause for relief from the penalties determined under I.R.C. § 6662(a) for either taxable year 2005 or 2006."  (A. 348, ¶ 9; *see also* A. 349, ¶ 10.)  On appeal, taxpayers raise no separate challenge to the imposition of the penalty.

[3] The Tax Court further determined that there was no deficiency in taxpayers' 2006 income tax, and that they were not liable for any penalties for that year.  (A. 531.)  The Commissioner has not appealed that determination.

11568703.1

limited liability company known as CST Investments, LLC (CST),[4] which consisted of two members, *i.e.,* "First Trust Company of Onaga FBO Terry Ellis IRA," a 98-percent member,[5] and "Richard Brown," a 2-percent member. (A. 5-6, ¶ 13; A. 114-142.) CST was purportedly formed with a $319,500 initial capital contribution from the Terry Ellis IRA, paid in exchange for 980,000 membership units, and a $20 initial capital contribution from Richard Brown, paid in exchange for 20,000 membership units.[6] (A. 142.)

Mr. Ellis was designated in CST's operating agreement as its general manager and served as such during all of 2005 and 2006. (A. 6, 118, 142.) Section 2.3 of the agreement provided that "the General Manager shall be entitled to such Guarantee Payment as is Approved by the Members." (A. 123.) Mr. Ellis applied for and received from the

---

[4] Despite what its name might imply, CST was not formed as a registered investment company under federal securities laws. (A. 6, ¶ 19.)

[5] At the time CST was formed, the Terry Ellis IRA was not in existence, but, as discussed *supra,* Mr. Ellis later established an Individual Retirement Account (IRA) with First Trust Company of Onaga serving as institutional custodian. (A. 6, ¶ 20; A. 7-8, ¶¶ 22-28.)

[6] Mr. Brown is unrelated to either of the taxpayers. (A. 9, ¶ 34.)

IRS, on June 2, 2005, a federal tax identification number for CST, which elected to report its federal income taxes as a corporation. (A. 7, ¶ 21; A. 153.) CST was formed to engage in used car sales, and it conducted that business during relevant times in Harrisonville, Missouri, with Mr. Ellis as its manager. (A. 6, ¶ 18.)

Mr. Ellis's attorney also formed in June 2005, a Missouri limited liability company called CDJ, LLC (CDJ), the members of which were Mr. Ellis, a 50-percent member, Mrs. Ellis, a 12.5-percent member, and the Ellises' three children, Christopher, Douglas, and Jamie, each a 12.5-percent member. (A. 14, ¶¶ 55, 57; A. 195, 199-224.) According to CDJ's operating agreement, Mr. Ellis contributed $50 to its capital, and each of the other members contributed $12.50 to its capital. (A. 224.) CDJ did not elect to be treated, for federal tax purposes as a corporation. (A. 14, ¶ 58.) In late December 2005, CDJ purchased a parcel of real property located at 23621 S. State Route 291, Harrisonville, Missouri (the Harrisonville property). (A. 14, ¶ 59.) The purchase price was $142,000, which CDJ paid with $12,000 in cash and $130,000 in mortgage financing obtained from the Bank of Lee's Summit. (A. 15, ¶¶ 60, 61.)

Beginning on January 1, 2006, CST leased the Harrionsville property from CDJ and operated its used car business thereon.  (A. 18, ¶ 79; A. 255-258.)  The lease was signed on behalf of CDJ, as lessor, by Mr. Ellis and Mrs. Ellis, and on behalf of CST, as lessee, by Mr. Ellis alone.  (A. 258.)  The lease was for 10 years and provided for annual rent to be paid by CST in monthly installments.  (A. 255-258.)

> **b.    Mr. Ellis's rollover of his employee retirement account to a traditional IRA, and his IRA's acquisition of membership units in CST**

On June 22, 2005, Mr. Ellis received a distribution of $254,206 from a qualified employee retirement plan (*see* I.R.C. § 401(k)) he had had with his former employer, Aventis Pharmaceuticals, Inc.  Mr. Ellis then rolled over that distribution to his traditional Individual Retirement Account (IRA) (*see* I.R.C. § 408(a)) with First Trust Company of Onaga (First Trust) as custodian.  (A. 7, ¶¶ 22-24.)  On June 23, 2005, Mr. Ellis caused his IRA to acquire 779,141 membership units of CST at a cost of $254,000.  (A. 7-8, ¶ 25.)  On August 19, 2005, Mr. Ellis received an additional distribution from his Aventis retirement plan in the amount of $67,139, which he rolled over to and deposited in his IRA.  (A. 8, ¶¶ 26-28.)  On August 23, 2005, he caused

his IRA to acquire another 200,859 membership units of CST at a cost of $65,500.  (A. 8-9, ¶ 30.)  Thus, at that point, Mr. Ellis's IRA had paid $319,500 for 980,000 membership units of CST, consistent with CST's operating agreement which was executed on the date CST was formed on May 25, 2005.  (A. 9, ¶ 32; A. 142.)

In November 2005, First Trust, as custodian of Mr. Ellis' IRA, requested an estimate of the fair market value of the IRA's membership interest in CST.  In December 2005, Mr. Ellis provided First Trust with his valuation.  (A. 10-11, ¶¶ 42-43.)  First Trust accordingly reported to the IRS on Form 5498, IRA Contribution Information, a fair market value of Mr. Ellis's IRA as of December 31, 2005, in the amount of $321,253, which consisted of the IRA's 98-percent interest in CST valued at $319,480 and cash of $1,773.  (A. 11, ¶ 46; A. 193.)

### 2. Relevant CST and CDJ transactions during 2005 and 2006, and the tax returns filed by CST, CDJ, and the Ellises for those years

During 2005 and 2006, CST paid compensation to Mr. Ellis in the amounts of $9,754 and $29,263, respectively, for his services as general manager of the used car business.  (A. 10, ¶¶ 36, 39; A. 18, ¶¶ 82, 85, 88.)  During 2006, CST made payments of rent to CDJ totaling $21,800

11568703.1

for its lease of the Harrisonville property. (A. 18, ¶ 80; A. 276.) These payments of compensation and rent were made by checks drawn on CST's corporate checking account, and not from Mr. Ellis's custodial IRA. (A. 10, ¶ 37; A. 18, ¶¶ 81, 83).

For 2005 and 2006, CST filed a Form 1120, U.S. Corporation Income Tax Return. (A. 10, ¶ 38; A. 18, ¶ 84.) For 2005, it claimed a deduction from corporate income for compensation paid to corporate officers, which consisted only of the $9,754 paid to Mr. Ellis. (A. 10, ¶ 39.) For 2006, it claimed a deduction from corporate income for compensation paid to corporate officers, consisting only of the $29,263 paid to Mr. Ellis. (A. 18, ¶ 85.)

For 2005 and 2006, CDJ filed Form 1065, U.S. Return of Partnership Income. (A. 15, ¶ 62; A. 19, ¶ 89.) It reported no gross income in 2005, $3,598 in deductions, and a net loss of $3,598. (A. 15, ¶ 63.) For 2006, CDJ reported zero gross income and zero deductions on page one, but on an attached Schedule 8825 it reported net rental income from real estate of $830, which was allocated to its members on Schedule K in accordance with their respective interests, *i.e.,* $415 to

Terry Ellis, $104 to Sheila Ellis, $104 to Christopher, $103 to Douglas, and $104 to Jamie. (A. 19-20, ¶¶ 90-94.)

On their jointly-filed 2005 Form 1040, U.S. Individual Income Tax Return, taxpayers reported adjusted gross income of $75,270, which included the $9,754 paid to Mr. Ellis by CST and also included their share of CDJ's $3,598 loss reported for that year in the amount of $2,249 ($1,799 allocable to Mr. Ellis and $450 allocable to Mrs. Ellis). (A. 15, ¶¶ 64, 65.) They reported receipt of pension distributions of $321,266, but that none of it was taxable. (A. 16, ¶ 68.)

Taxpayers filed their joint 2006 income tax return late on July 6, 2007. (A. 20, ¶ 95.) On that return, they reported total adjusted gross income of $72,705, which included the $29,263 paid to Mr. Ellis by CST and also included their share of CDJ's $830 net rental income reported for that year in the amount of $519 ($450 allocable to Mr. Ellis and $104 allocable to Mrs. Ellis). (A. 20-21, ¶¶ 96-100.)

### 3. The Commissioner's notice of deficiency and the Tax Court proceedings commenced by taxpayers

The Commissioner determined by notice of deficiency that taxpayers were liable for an income-tax deficiency of $135,936 for 2005, or, in the alternative, an income-tax deficiency of $133,067 for 2006. (A.

5, ¶ 8; A. 94-109.) The Commissioner further determined in the notice that taxpayers were liable for an accuracy-related penalty under I.R.C. § 6662(a) of $27,187 for 2005, or, in the alternative, $26,613 for 2006, and, if the deficiency determination for 2006 were applicable, that they are liable under I.R.C. § 6651(a)(1) for a penalty of $19,731 for failure to file their 2006 return on time. (A. 94-109.) (The parties stipulated below that, if the Ellises are liable for the deficiency determined in either 2005 or 2006, they are also liable for the accuracy-related penalty in such year (A. 348-349), and if they are liable for the deficiency asserted against them in 2006, they are liable for the late-filing penalty (A. 24).)

As relevant to this appeal, the Commissioner determined, specifically, that Mr. Ellis had engaged in prohibited transactions under I.R.C. § 4975 with respect to his IRA in either 2005 or 2006, with the result that, as of the first day of the year in which a prohibited transaction occurred, Mr. Ellis's IRA "ceased to be an individual retirement account" under I.R.C. § 408(e)(2)(A), and the fair market value of the IRA was deemed distributed to him on the first day of such year pursuant to I.R.C. § 408(e)(2)(B). (A. 108.) Moreover, the

Commissioner determined that, for the year in which a prohibited transaction first occurred, taxpayers were liable for the 10-percent additional tax (*see* I.R.C. § 72(t)). (*Ibid.*)

Taxpayers filed a timely petition in the Tax Court. (Doc. 1.) As amended (Doc. 3), the petition disputed the Commissioner's determination that Mr. Ellis engaged in a prohibited transaction with respect to his IRA in either 2005 or 2006. (Doc. 1.) The material facts were undisputed by the parties, and the case was submitted for decision by the Tax Court on a fully stipulated record pursuant to Rule 122 of the Tax Court Rules of Practice and Procedure. (Pet. App. 350-352.)

Taxpayers asserted (A. 407-419) that Mr. Ellis had properly rolled over his I.R.C. § 401(k) retirement funds into a self-directed IRA ("the Plan"), and had properly caused the Plan to invest in the 980,000 membership units of CST without running afoul of I.R.C. § 4975(c)'s prohibited-transaction provisions. They further argued (*ibid.*) that Mr. Ellis's receipt of compensation from CST in 2005 and 2006, and his execution of a lease between CST and CDJ in 2006, were not prohibited transactions between the Plan and himself.

Taxpayers acknowledged that Mr. Ellis was a "disqualified person" and "fiduciary" with respect to the Plan, as defined in the prohibited-transaction provisions, and that, as such, he was precluded from engaging in certain transactions with the Plan. (A. 466.) In addition, taxpayers conceded that, if Mr. Ellis had engaged in prohibited transactions with the Plan, the Plan would cease to be exempt and its assets would be deemed fully distributed to him, and that the 10-percent additional tax imposed by I.R.C. § 72(t) would apply. (A. 465.) Taxpayers contended, however (A. 411-419, 467-471), that, under the Department of Labor's (DOL) plan-assets regulation, 29 C.F.R. § 2510.3-101, the assets of an "operating company" in which a qualified plan – *e.g.,* an IRA – invests are not deemed to be "plan assets," and, since CST was an operating company, Mr. Ellis's transactions with CST were not deemed to be with the Plan itself and thus were not prohibited. They further contended (A. 410, 419) that, even if CST's assets were plan assets, I.R.C. § 4975(d)(2) and (d)(10) exempted Mr. Ellis's receipt of reasonable compensation and rent (*i.e.,* through CDJ) from being treated as prohibited transactions.

The Commissioner explained (A. 382) that § 4975(c)(1) defines a prohibited transaction to include "any direct or indirect–(A) sale or exchange, or leasing, of any property between a plan and a disqualified person; . . . (D) transfer to, or use by or for the benefit, of a disqualified person of the income or assets of a plan; [or] (E) act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account."  The Commissioner pointed out (A. 383) that the consequences of participating in one of these prohibited transactions are applicable *per se* without regard to whether the transaction was made in good faith or whether it actually enhanced the value of the plan.

The Commissioner asserted (and taxpayers did not dispute) that Mr. Ellis was a fiduciary and disqualified person with respect to his IRA, and CDJ was a disqualified person, since it was owned by him and his immediate family.  (A. 383-386.)  The Commissioner thus concluded that prohibited transactions occurred when Mr. Ellis caused his IRA in 2005 to invest in CST as part of an arrangement that anticipated he would be employed and paid by CST; caused CST in 2005 and 2006 to

Appellate Case: 14-1310    Page: 23    Date Filed: 06/23/2014 Entry ID: 4167875

pay him compensation; and caused CST in 2006 to enter into a lease with CDJ and pay rent to CDJ. (A. 386-394.)

The Commissioner emphasized that when Mr. Ellis directed his IRA to invest in CST it was part of an arrangement or understanding under which the expectation was that CST would provide Mr. Ellis with personal, financial benefits. (*Ibid.*) The Commissioner maintained that under the Department of Labor's (DOL) long-standing position (Interpretive Bulletin 75-2 and Advisory Op. No. 75-103), these circumstances of self-dealing placed Mr. Ellis's IRA investment outside the operating-company exception in the DOL's plan-assets regulation, 29 C.F.R. § 2510.3-101(a)(2)(i), upon which taxpayers relied. (*Ibid.*)[7]

In response to taxpayers' contention that the amounts of compensation and rent paid by CST were nevertheless exempt from treatment as prohibited transactions by I.R.C. § 4975(d)(2) and (d)(10), the Commissioner countered that those provisions expressly applied only to amounts paid in direct connection with administering "the plan"

---

[7] The Department of Labor possesses interpretative authority over I.R.C. § 4975 pursuant to Presidential Reorganization Plan No. 4 of 1978, effective December 31, 1978. 43 F.R. 47713 (Oct. 17, 1978).

and not to amounts paid to operate a used car company in which the plan invested.  (A. 499-500.)

Finally, the Commissioner maintained that the tax consequences of engaging in a prohibited transaction (which taxpayers also did not dispute) were that the IRA would be deemed fully distributed and taxable in the year a prohibited transaction was determined to have first occurred, and an additional 10-percent tax on the early distribution would be imposed under I.R.C. § 72(t).  (A. 394-396.)

The Tax Court issued a memorandum opinion holding in favor of the Commissioner.  (A. 504-530.)  It determined that Mr. Ellis had participated in a prohibited transaction with respect to his IRA in 2005, when he effectively directed CST to pay him compensation for services as an employee and general manager.  (A. 522-526.)  The Tax Court explained that "Mr. Ellis seeded his plan in June of 2005 with the proceeds from his section 401(k) plan account with his former employer [and] then exerted control over his IRA in causing it to engage in the purchase of membership units of CST."  (A. 519.)  It thus concluded that "Mr. Ellis was a fiduciary of his IRA . . . and consequently a disqualified person with respect to that plan."  (*Ibid.*)  The court went on to observe

that "Mr. Ellis was the sole individual for whose benefit the IRA was established and therefore the beneficial owner of 98% of the outstanding interests of CST," and that CST was, as a consequence, also a disqualified person under § 4975(e)(2)(G). (A. 523.) The court further noted that, "as the fiduciary of his IRA – a member of CST with 98% of the outstanding ownership interest – and the general manager of CST, Mr. Ellis ultimately had discretionary authority to determine the amount of his compensation and effect its issuance in either circumstance." (*Ibid.*)

In light of these circumstances, the Tax Court concluded as follows (A. 524-525):

> In causing CST to pay him compensation, Mr. Ellis engaged in the transfer of plan income or assets for his own benefit in violation of section 4975(c)(1)(D). Furthermore, in authorizing and effecting this transfer, Mr. Ellis dealt with the income or assets of his IRA for his own interest or for his own account in violation of section 4975(c)(1)(E). . . .

> In essence, Mr. Ellis formulated a plan in which he would use his retirement savings as startup capital for a used car business. Mr. Ellis would operate this business and use it as his primary source of income by paying himself compensation for his role in its day-to-day operation. Mr. Ellis effected this plan by establishing the used car business as an investment of his IRA, attempting to preserve the integrity of the IRA as a qualified retirement plan.

11568703.1

However, this is precisely the kind of self-dealing that section 4975 was enacted to prevent.

The court rejected the taxpayers' argument that the compensation paid to Mr. Ellis by CST was not from plan assets but was from an operating company in which the plan invested. (A. 523-524.) It noted that CST was funded nearly entirely by Mr. Ellis's IRA and that the IRA consisted of only the ownership interest it had in CST. (A. 524.) The court thus held that taxpayers' contention that the Plan held only a mere investment in CST was "a complete mischaracterization," because CST and the Plan were essentially one and the same. (*Ibid.*) The court also rejected taxpayers' argument that the compensation paid was reasonable and for that reason exempt under § 4975(d)(10) from treatment as a prohibited transaction. (A. 524-525.) It held that the exemption applied only to compensation for services rendered in administering or managing the plan, and not to compensation for services rendered in carrying on a used car business in which the Plan invested all of its assets. (*Ibid.*)

In deciding the case, the Tax Court also held, contrary to the position advocated by the Commissioner, that Mr. Ellis's formation of CST, and self-directed investment of his IRA in CST, did not in itself

result in a prohibited transaction. (A. 520-522.) Relying on its opinion in *Swanson v. Commissioner,* 106 T.C. 76 (1976), the court reasoned that CST (a limited liability company) was not a disqualified person at the time it was formed, because, like the C corporation in *Swanson,* which had no shareholders when formed, CST had no owners when formed and thus did not originally fit within the definition of a disqualified person at § 4975(e)(2)(G). (*Ibid.*) *See Swanson,* 106 T.C. at 88. The Tax Court accordingly found that the IRA's subsequent purchase of membership units in CST was not a transaction between a plan and a disqualified person, and thus could not be a prohibited transaction under § 4975(c)(1).[8] (A. 521-522.)

Nevertheless, the court held that, because a prohibited transaction did occur in 2005, the effect was to disqualify the IRA as of the first day of 2005 and to deem its assets fully distributed and

---

[8] The court noted that the Commissioner had argued that Mr. Ellis's self-directed IRA investment in CST was a prohibited transaction because it was part of an arrangement under which Mr. Ellis expected to receive benefits from CST. (A. 522 n. 21.) The court concluded that it need not address that contention because of its determination that CST's payment of compensation to Mr. Ellis in 2005 was a prohibited transaction in any event. (*Ibid.*)

11568703.1

includible in taxpayers' gross income as of that day. (A. 526-527.) It also held that taxpayers were subject to the 10-percent additional tax on early plan distributions under I.R.C. § 72(t). (A. 528.) The Tax Court entered a decision that taxpayers owe a deficiency in tax and an accuracy-related penalty for 2005 in the amounts determined by the Commissioner in the notice of deficiency. (A. 531.) Taxpayers now appeal to this Court. (A. 532.)

## SUMMARY OF ARGUMENT

Taxpayers appeal the Tax Court's determination that in 2005 Mr. Ellis engaged in a prohibited transaction under I.R.C. § 4975(c)(1) with respect to his IRA, resulting in the IRA assets being treated as fully distributed in 2005 and includible in taxpayers' gross income in that year.

In 2005, Mr. Ellis rolled over to an IRA the $320,000 he had in a retirement account with his former employer. He then directed his IRA use all of its funds to acquire essentially all of the equity interests of a newly formed limited liability company known as CST, which was created to allow Mr. Ellis to operate a used car business. The only other equity interest in CST was acquired for $20 by an unrelated party. CST

11568703.1

was obligated in its operating agreement to pay Mr. Ellis compensation annually as its general manager.  Shortly thereafter, an entity known as CDJ was formed in which Mr. Ellis owned a 50-percent interest and his spouse and children owned the other 50-perecent interest.  CDJ leased real property to CST on which the used car business was operated.  CST made payments of compensation to Mr. Ellis during 2005 and 2006, and also made payments of rent to CDJ during 2006.

Section 4975(c)(1) of the Internal Revenue Code identifies prohibited transactions concerning a qualified retirement plan, including an individual retirement account (IRA) described in I.R.C. § 408(a).  A "prohibited transaction" includes "any direct or indirect" – "sale or exchange, or leasing, of any property between a plan and a disqualified person" (§ 4975(c)(1)(A), "transfer to, or use by or for the benefit, of a disqualified person of the income or assets of a plan" (§ 4975(c)(1)(D)), or "act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account."  It is undisputed that, with respect to his IRA, Mr. Ellis was a fiduciary and disqualified person, CST was a

disqualified person (after the IRA invested in it) and CDJ was a disqualified person. *See* I.R.C. § 4975(e).

As the Tax Court found, the IRA's investment in CST was part of an arrangement or understanding under which it was expected that Mr. Ellis would benefit as a result of CST's payment of compensation and rents. As such, the arrangement resulted in a prohibited transaction in 2005 under I.R.C. § 4975(c)(1). *See* DOL Interpretative Bulletin 75-2, 29 C.F.R. § 2509.75-2(c). Taxpayers improperly disregarded the significance of this arrangement to indirectly transfer or use plan assets for the benefit of Mr. Ellis. Instead, they center their defense on the nature of CST. They argue that a prohibited transaction did not occur between a fiduciary or disqualified person and *the Plan*, because the IRA's investment in CST was in an operating company, and, under the Department of Labor's plan-assets regulation, 29 C.F.R. § 2510.3-101(a)(2)(i), the assets of CST are generally not considered assets of the IRA. They argue, therefore, that Mr. Ellis did not receive any payments from the Plan, but only received payments from assets of CST.

Taxpayers' reliance on the plan-assets regulation to immunize Mr. Ellis's improper self-dealing with his IRA is misconceived. In its

Interpretive Bulletin 75-2, 29 C.F.R. § 2509.75-2, the Department of Labor expressly indicated that the plan-assets regulation did not supplant the provisions of the Interpretive Bulletin prohibiting self-dealing arrangements such as the one here. Moreover, the controlling provision of the Internal Revenue Code, I.R.C. § 4975(c)(1), makes clear that a prohibited transaction includes "indirect" self-dealing between a fiduciary or disqualified person, and does not require that the transaction be directly with the plan. I.R.C. § 4975(c)(1). Thus, both the IRA's initial investment in CST and the payment to Mr. Ellis were part of a prohibited use and transfer of the IRA's assets to a disqualified person, indirectly, through CST. Nothing in the plan-assets regulation or in any other law gives a pass for such fiduciary self-dealing. The plan-assets regulation is not relevant here.

Finally, taxpayers are in error in contending that the compensation and rents paid by CST were exempted from treatment as prohibited transactions by I.R.C. § 4975(d)(2) and (10), because the amounts of the payments were reasonable. Those exemptions apply only to amounts paid to a fiduciary or disqualified person for services provided to the plan or necessary for the administration of the plan.

11568703.1

The compensation and rents paid here were not for services provided directly to Mr. Ellis's IRA or for services necessary to administer Mr. Ellis's IRA. On the contrary, the payments did not relate to the IRA at all, but, instead, pertained to the operation of Mr. Ellis's used car business that he operated through CST. Moreover, such payments could not be "reasonable" because they were part of an arrangement or understanding to use plan assets indirectly to benefit a fiduciary. Hence, although I.R.C. § 4975(d)(2) and (10) can exempt a transfer or use of plan assets and other violations under § 4975(c)(1)(A) through (D), they never exempt fiduciary self-dealing under § 4975(c)(1)(E). As the Tax Court held, the exemption provisions in § 4975(d) do not apply in this case.

The decision of the Tax Court is correct and should be affirmed.

11568703.1

## ARGUMENT

**The Tax Court correctly held that during 2005 Mr. Ellis engaged in a prohibited transaction under I.R.C. § 4975(c)(1) with respect to his IRA, with the result that the IRA ceased to be exempt from tax in 2005 and its assets are deemed to be fully distributed to him as of the first day of that year**

### Standard of review

As noted, this case was decided by the Tax Court on a fully stipulated record. Its application of law to the facts is reviewed by this Court *de novo*. *Musco Sports Lighting, Inc. v. Commissioner,* 943 F.2d 906, 907 (8th Cir. 1991).

### A.    Introduction

In 1974, Congress enacted comprehensive legislation – the Employee Retirement Income Security Act (ERISA), Pub. L. 93-406, 88 Stat. 829 – to, *inter alia,* protect the interests of participants in private pension plans and their beneficiaries. *See* 29 U.S.C. § 1001 (setting forth the preamble to ERISA); *see also Baizer v. Commissioner*, 204 F.3d 1231, 1234 (9th Cir. 2000). Relevant here are the parallel Treasury and Labor provisions in ERISA, codified at I.R.C. § 4975 and 29 U.S.C. § 1106, which identify prohibited transactions between certain interested persons and a qualifying retirement plan. In this regard,

"both the Internal Revenue Service and the Department of Labor administer ERISA's prohibited-transaction provisions." *Commissioner v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 158 (1993).[9]

At issue here is I.R.C. § 4975(c)(1), which identifies prohibited transactions concerning a qualified retirement plan, including an individual retirement account (IRA) described in I.R.C. § 408(a). *See* I.R.C. § 4975(e)(1)(B). As relevant here, a "prohibited transaction" includes "any direct or indirect" – "sale or exchange, or leasing, of any property between a plan and a *disqualified person*" (I.R.C. § 4975(c)(1)(A) (emphasis added)); "transfer to, or use by or for the benefit, of a *disqualified person* of the income or assets of a plan" (I.R.C. § 4975(c)(1)(D) emphasis added)); or "act by a *disqualified person* who is a *fiduciary* whereby he deals with the income or assets of a plan in his own interest or for his own account" (I.R.C. § 4975(c)(1)(E) (emphasis added)). The prohibited transactions enumerated in I.R.C. § 4975(c)(1) are not mutually exclusive; a transaction may fall within the scope of

---

[9] As indicated, the Department of Labor possesses interpretative authority over I.R.C. § 4975 pursuant to Presidential Reorganization Plan No. 4 of 1978, effective December 31, 1978. 5 U.S.C. app. at 214, 43 FR 47713 (October 17, 1978).

11568703.1

more than one of those defined in that subparagraph. *See, e.g., Janpol v. Commissioner*, 101 T.C. 518, 525 (1993).

A "disqualified person" with respect to an IRA includes, *inter alia*, a "fiduciary." I.R.C. § 4975(e)(2)(A). An individual who possesses or exercises "discretionary authority or discretionary control" over the management of his IRA and the disposition of his IRA's assets is a "fiduciary" with respect to his IRA for purposes of I.R.C. § 4975. I.R.C. § 4975(e)(3). *See Flahertys Arden Bowl, Inc. v. Commissioner*, 115 T.C. 269, 274-78 (2000), *aff'd*, 271 F. 3d 763 (8th Cir. 2001) (individual who possesses discretionary authority over the management and disposition of his retirement account is a fiduciary for purposes of I.R.C. § 4975); *see also* DOL Advisory Op. 2000-10A (July 27, 2000) (an IRA owner who self-directs investments attributable to his IRA is both a fiduciary and disqualified person with respect to the IRA).[10]

---

[10] Advisory opinions from the Department of Labor "need not be given deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)," but they nevertheless "may have persuasive value . . . if thoroughly considered and well reasoned." *Benefits Committee of Saint-Gobain Corp. v. Key Trust Co. of Ohio, N.A.*, 313 F.3d 919, 926 (6th Cir. 2002) (internal quotation marks omitted). *Cf.* Advisory Op. Procedure, 41 F.R. 36281, 36283 (Aug. 27,

(continued…)

Thus, a plan fiduciary is a disqualified person, but a disqualified person is not necessarily a fiduciary. In this regard, a "disqualified person" also includes, as pertinent to this case, a person providing services to the plan (I.R.C. § 4975(e)(2)(B)); a member of the family of a plan fiduciary (including his spouse and children) (I.R.C. § 4975(e)(2)(F)); and a partnership owned at least 50-percent, directly or indirectly, by a plan fiduciary (I.R.C. § 4975(e)(2)(G)).

The prohibited transaction rules enacted as part of ERISA were designed, in part, to prevent parties in interest, *i.e.,* disqualified persons,[11] and persons with fiduciary responsibilities, from using a qualified retirement plan to engage in transactions for their own account that could place plan assets and income at risk of loss prior to retirement. *See* S. Rep. No. 93-383 (1974), 1974-3 C.B. (Supp.) 80, 87,

---

(…continued)
1976) ("Only the parties described in the request for an opinion may rely on the opinion . . .".).

[11] The term "party in interest" as used in Department of Labor statutes and regulations under ERISA is analogous in all respects relevant to this case to the term "disqualified person" as used in the Internal Revenue Code. *See Flahertys Arden Bowl, Inc.,* 115 T.C. at 273; *Rutland v. Commissioner,* 89 T.C. 1137, 1143 n. 5 (1987). *Accord* DOL Advisory Op. 2006-01A (Jan. 6, 2006), 2006 WL 149107, *2 (ERISA).

110-12; H.R. Rep. No. 93-807 (1974), 1974-3 C.B. (Supp.) 236, 248-49.

The transactions listed in I.R.C. § 4975(c)(1) are thus *per se* prohibited

transactions. *See, e.g.*, *Westoak Realty and Inv. Co., Inc. v.*

*Commissioner*, 999 F.2d 308, 311 (8th Cir. 1993) (it is irrelevant that a

prohibited transaction under § 4975 was made in good faith and yielded

a good return on investment; the statutory consequences for engaging in

the prohibited transaction nevertheless attach). In other words: "The

fact that the transaction would qualify as a prudent investment when

judged under the highest fiduciary standards is of no consequence. . . .

Good intentions and a pure heart are no defense" to the I.R.C. § 4975

prohibited-transaction rules. *Leib v. Commissioner*, 88 T.C. 1474, 1480

(1987).

The statutory consequence for engaging in a prohibited

transaction with respect to an IRA is that the IRA ceases, as of the first

day of the year in which the prohibited transaction occurs, to qualify as

a tax-advantaged retirement plan, and all of its assets are deemed fully

distributed to the owner and includible in his gross income. I.R.C.

§§ 408(e)(2), 61(a). As a further consequence, the deemed early

distribution from the plan is subject to the 10-percent additional tax

imposed at I.R.C. § 72(t), unless otherwise exempt under that subsection (*e.g.*, where the recipient has attained the age of 59½ (*see* I.R.C. § 72(t)(2)(A)(i)). Taxpayers do not dispute that the above-described tax consequences would flow from the occurrence of a prohibited transaction in this case. Taxpayers, however, disagree with the Tax Court's determination that in 2005 Mr. Ellis engaged in a prohibited transaction. As is demonstrated below, the Tax Court's decision is correct.

### B. Under I.R.C. § 4975(e)(2) and (3), Mr. Ellis was a fiduciary and disqualified person, and CST, CDJ and Mr. Ellis's spouse and children were disqualified persons

When Mr. Ellis rolled over his retirement account at Aventis into an IRA at First Trust, he retained all discretionary authority and control over his "self-directed" IRA. (A. 6, 7, 8, ¶¶ 20, 25, 29; A. 150-151, 161-162, 168-169.) He exercised this authority and control when he caused his IRA to invest in CST. (A. 7, 8, ¶¶ 25, 29; A. 161-162, 168-169.) Mr. Ellis was, therefore, a fiduciary of his IRA at First Trust and, as a fiduciary, he also was a disqualified person with respect to the IRA. I.R.C. § 4975(e)(2)(A). *See also Flahertys Arden Bowl, Inc.,* 115 T.C. at 274-78. Taxpayers concede as much. (Br. 7, 18.)

11568703.1

In addition, an entity in which 50-percent or more of the combined voting power is owned by a fiduciary is a disqualified person. I.R.C. § 4975(e)(2)(G). Once Mr. Ellis transferred the assets of his IRA to CST in exchange for the IRA's acquisition of CST's membership units, CST then became a disqualified person, because Mr. Ellis, a fiduciary of the Plan, was deemed to have constructive ownership of a beneficial interest in CST, which exceeded 50-percent. *See* I.R.C. § 4975(e)(2)(G), (e)(4) and I.R.C. § 267(c). Taxpayers also concede this point. (Br. 7, 18.)

The voting members of CDJ, a limited liability company electing tax treatment as a partnership, included Mr. Ellis (a 50-percent owner), his spouse (a 12.5-percent owner), and their three children (each a 12.5-percent owner). (A. 14, ¶ 57; A. 281-285.) Because Mr. Ellis, a fiduciary of his IRA, owned 50-percent of CDJ, CDJ was a disqualified person with respect to the IRA. I.R.C. § 4975(e)(2)(G). Indeed, in determining Mr. Ellis's ownership interest for this purpose, he is deemed to have constructive ownership of 100-percent of CDJ, because the ownership interests of his spouse and children are attributed to him. *See* I.R.C. §§ 4975(e)(5) & (6), 267(c)(4).

Finally, an IRA fiduciary's spouse, ancestor, lineal descendant, and spouse of a lineal descendant are also disqualified persons. *See* I.R.C. § 4975(e)(2)(F) & (e)(6). Thus, Mr. Ellis's spouse and children were disqualified persons.

### C. A prohibited transaction within the meaning of I.R.C. § 4975(c)(1) occurred when Mr. Ellis directed his IRA to acquire a 98-percent interest in CST in 2005, because the investment was part of an arrangement or understanding under which it was expected that CST would make payments of compensation to Mr. Ellis and payments of rent to CDJ

Taxpayers' appeal is focused on the DOL plan-assets regulation, 29 C.F.R. § 2510.3-101. (Br. 9-24.) The plan-assets regulation provides, in relevant part, as follows (29 C.F.R. § 2510.3-101(a)(2)(i)):

> [I]n the case of a plan's investment in an equity interest of an entity that is neither a publicly-offered security or a security issued by an investment company registered under the Investment Company Act of 1940 its assets include both the equity interest and an undivided interest of the underlying assets of the entity, unless it is established that–
>
> (i) the entity is an operating company
>
> *        *        *        *        *

In other words, as a general matter for purposes of ERISA, the assets of an operating company in which a plan invests are not considered to be assets of the plan itself. Taxpayers argue that, inasmuch as CST was

an operating company engaged in the used car business, its assets are not considered assets of Mr. Ellis's Plan. They then conclude that payments of compensation and rent by CST to Mr. Ellis and CDJ, respectively, were not made from assets of the plan (Mr. Ellis's IRA), and thus did not run afoul of the prohibition in I.R.C. § 4975(c)(1)(D) & (E) on transactions involving self-dealing between a fiduciary and/or a disqualified person and *the plan.* As demonstrated below, however, taxpayers' reliance on the plan-assets regulation is misconceived.

### 1. Irrespective of the plan-assets regulation, Mr. Ellis's self-directed investment of his IRA's assets in CST resulted in prohibited self-dealing with his IRA under I.R.C. § 4975(c)(1)(D) and (E)

In relying on the plan-assets regulation to immunize Mr. Ellis's investment of his IRA assets in CST, taxpayers wholly ignore the Department of Labor's Interpretative Bulletin 75-2, appearing at 29 C.F.R. § 2509.75-2, which provides that a prohibited transaction under I.R.C. § 4975 can occur without regard to whether a plan fiduciary or disqualified person is paid directly from plan assets. Interpretative Bulletin 75-2 makes clear that a prohibited transaction occurs under I.R.C. § 4975(c)(1)(D) when a plan invests in an entity as part of an arrangement whereby it is expected that the entity will

11568703.1

engage in a transaction with a party in interest, *i.e.,* a disqualified person.  *See* 29 C.F.R. § 2509.75-2(c).  *See also*, DOL Advisory Opinion 75-103 (Oct. 22, 1975), 1975 WL 4573 (ERISA).  Furthermore, if a disqualified person who is a fiduciary enters into an arrangement that anticipates plan assets will be used in a manner designed to benefit such fiduciary, then a prohibited transaction under I.R.C. § 4975(c)(1)(E) occurs.  *See* 29 C.F.R. § 2509.75-2(c); DOL Advisory Op. No. 2011-04A, 2011 WL 585772, *2 (ERISA).

The preamble to 29 C.F.R. § 2509.75-2 points out that the plan-assets regulation was promulgated in November 1986 to define "plan assets" for purposes of applying the fiduciary responsibility provisions of ERISA.  Importantly, that preamble unequivocally also states that "[p]aragraphs (b) and (c) of this Interpretative Bulletin, however, relate to matters outside the scope of § 2510.3-101 [the plan-assets regulation], and *nothing in that section affects the continuing application of the principles discussed in those parts*."  29 C.F.R. § 2509.75-2 (preamble) (emphasis added); *see* DOL Advisory Op. No. 2006-01A, 2006 WL 149107, *2 n. 3 (noting that 29 C.F.R. § 2509.75.2(c)

has remained in force even after promulgation of the plan-assets regulation).

Section 2509.75-2(a) acknowledges that it is a general principle of the plan-assets regulation that the acquisition by a plan of the equity of a corporation or partnership and a subsequent transaction "between such corporation or partnership and a party in interest will not be a prohibited transaction solely by reason of the plan's investment in the corporation or partnership." Section 2509.75-2(c) provides, however, that this general proposition does "not mean that an investment of plan assets in a security of a corporation or partnership may not be a prohibited transaction." In this regard, it states that any "direct or indirect transfer to, or use by or for the benefit of, a party in interest of any assets of the plan" is prohibited and that a fiduciary is prohibited "from dealing with the assets of the plan for his own interest or for his own account." *Ibid.* It goes on to provide examples of arrangements under which a plan invests in an entity and as part of the arrangement "it is expected" that the entity will provide a benefit to a party in interest, and instructs that such an arrangement is a prohibited transaction. *Ibid.* In addition, 29 C.F.R. § 2509.75-2 sets forth the

11568703.1

following general principle with respect to a plan investment in a corporation or partnership:

> [I]f a transaction between a party in interest and a plan would be a prohibited transaction, then such a transaction between a party in interest and such corporation or partnership will ordinarily be a prohibited transaction if the plan may, by itself, require the corporation or partnership to engage in such transaction.

Advisory opinions of the DOL have thus concluded that, even though a fiduciary or disqualified person will not directly receive a benefit from plan assets that he self-directs to be invested in a partnership or corporation, the investment arrangement will nevertheless result in a prohibited transaction if the arrangement contemplates his future receipt of a benefit from the partnership or corporation. *See* DOL Advisory Op. 2011-04A, 2011 WL 585772, *2 ("acquisition and holding [of interest in an entity] by the IRA would violate Code section 4975(c)(1)(D) and (E) if the transaction was part of an agreement, arrangement or understanding in which the fiduciary caused plan assets to be used in a manner designed to benefit such fiduciary"); DOL Advisory Op. 2006-01A, 2006 WL 149107, *2 ("Regulation section 2509.75-2(c) and Department opinions interpreting it have made clear that a prohibited transaction occurs when a plan

11568703.1

invests in a corporation as part of an arrangement or understanding
under which it is expected that the corporation will engage in a
transaction with a party in interest (or disqualified person)."); DOL
Advisory Op. 2000-10A, 2000 WL 1094031, *3 (ERISA) ("if an IRA
fiduciary causes the IRA to enter into a transaction where, by the terms
or nature of that transaction, a conflict of interest between the IRA and
the fiduciary . . . exists or will arise in the future, that transaction
would violate either [§] 4975(c)(l)(D) or (E) of the Code").

The record here establishes such a prohibited arrangement to
benefit Mr. Ellis, and its terms are clear.  It is undisputed that in May
2005 a lawyer hired by Mr. Ellis formed CST as a limited liability
company and organized it to consist of two members, *i.e.,* the custodian
of Mr. Ellis's IRA, First Trust, a 98-percent member with 980,000
membership units, and an unrelated party, Richard Brown, a 2-percent
member with 20,000 membership units for which he paid $20.  (A. 5-6,
¶¶ 13, 14; A. 111-112, 114-142); that Mr. Ellis was designated in CST's
operating agreement as its general manager and served as such during
all of 2005 and 2006 (A. 6, 118, 142); that the operating agreement
provided for a guarantee payment to be paid to the general manager as

approved by the members (A. 123); that CST was formed to engage in used car sales, and it conducted that business during relevant times in Harrisonville, Missouri (A. 6, ¶ 18); that in June and August 2005 Mr. Ellis rolled over his ERISA retirement account (a total of $321,139) from his former employer, Aventis, to his IRA at First Trust (A. 7-8, ¶¶ 22-28); and that in those same months he caused his IRA to expend $319,500 to acquire a 98-percent interest in CST, consistent with CST's operating agreement (A. 7-9, ¶¶25, 30.)

It is further undisputed that shortly thereafter, in June 2005, Mr. Ellis's lawyer formed CDJ as a limited liability company and organized it to consist of five members, Mr. Ellis, a 50-percent owner, Mrs. Ellis, a 12.5-percent owner, and the Ellises' three children, each a 12.5-percent owner (A. 14, ¶¶ 55, 57; A. 195, 199-224); that by late 2005 CDJ purchased the Harrisonville property (A. 14, 15; ¶¶ 59-61); and that, beginning on January 1, 2006, CST and CDJ entered into a 10-year lease whereby CDJ leased the Harrionsville property to CST in exchange for monthly payments of rent and CST operated its used car business thereon (A. 18, ¶ 79; A. 255-258).

Finally, it is undisputed that, under the above arrangement or understanding, CST paid compensation to Mr. Ellis in the amounts of $9,754 and $29,263 during 2005 and 2006, respectively, for his services as general manager of the used car business (A. 10, ¶¶ 36, 39; A. 18, ¶¶ 82, 85, 88), and that it also made payments of rent to CDJ totaling $21,800 during 2006 for its lease of the Harrisonville property (A. 18, ¶ 80; A. 276).

In essence, this was an arrangement or understanding through which cash assets of Mr. Ellis's IRA were used to establish a closely-held start-up used car business operated by Mr. Ellis, and owned indirectly by him through his IRA, which would then serve as his employer and provide him, and his family, with financial benefits in the form of wage and rent payments. Based on this record, it is abundantly clear that Mr. Ellis directed his IRA to invest in CST as part of an arrangement or understanding whereby it was expected that CST would engage in a transaction with him in a manner designed to benefit him. Because he was a fiduciary and disqualified person with respect to the IRA, a prohibited transaction occurred when the investment arrangement was effectuated in 2005. 29 C.F.R. § 2509.75-2(c); I.R.C.

11568703.1

§ 4975(c)(1)(D) & (E). As discussed in part 2 below, the Tax Court correctly so held. (A. 519, 523-525.) Moreover, it was anticipated, as part of the arrangement or understanding, that CST would pay a benefit to CDJ in the form of rent, and, because CDJ and its members were also disqualified persons, the IRA's investment in CST was a prohibited transaction for this reason too. *Ibid.*; *see also* I.R.C. § 4975(c)(1)(A) (prohibiting indirect lease of property between plan and disqualified person).

As the Tax Court correctly recognized, Mr. Ellis "formulated a plan in which he would use his retirement savings as startup capital for a used car business [and] would operate this business and use it as his primary source of income by paying himself compensation for his role in its day-to-day operation." And it correctly concluded that "this is precisely the kind of self-dealing that section 4975 was enacted to prevent." (A. 525.) The plan-assets regulation notwithstanding, this use of retirement plan assets for the current benefit of a fiduciary and disqualified person is precisely the type of self-dealing that the *per se* prohibited-transaction rules were promulgated to prevent. 29 C.F.R. § 2509.75-2(c).

### 2. The Tax Court's holding in this case is consistent with the above analysis and with § 4975(c)(1)'s prohibition on Mr. Ellis's "indirect" self-dealing with his IRA

The Tax Court did not expressly address the Commissioner's argument under subsection (c) of Interpretive Bulletin 75-2 (*i.e.,* 29 C.F.R. § 2509.75-2(c)) that Mr. Ellis's self-directed investment of his IRA in CST was a prohibited transaction because it was part of an arrangement under which it was expected that CST would pay benefits to Mr. Ellis and his family. Nevertheless, the court concluded, consistent with the Interpretive Bulletin, that CST's payment of compensation to Mr. Ellis in 2005 was a prohibited transaction. In so doing, it effectively applied the principles of 29 C.F.R. § 2509.75-2(c) and I.R.C. § 4975(c)(1)(D) and (E).

The Tax Court found in this regard that "Mr. Ellis seeded his plan in June of 2005 with the proceeds from his section 401(k) plan account with his former employer [and] then exerted control over his IRA in causing it to engage in the purchase of membership units of CST." (A. 519.) It reasoned that he "ultimately had discretionary authority to determine the amount of his compensation and effect its issuance in either circumstance." (*Ibid.*) It rejected taxpayers' reliance on the plan-

11568703.1

assets regulation, concluding that any differentiation between the assets of the IRA and those of CST was "a complete mischaracterization," because CST and the plan were essentially one and the same. (A. 523-524.) The Tax Court thus held (A. 524) that "Mr. Ellis engaged in the transfer of plan income or assets for his own benefit in violation of section 4975(c)(1)(D)" and "dealt with the income or assets of his IRA for his own interest or for his own account in violation of section 4975(c)(1)(E)."

In the end, the Tax Court's analysis comports with the rule in 29 C.F.R. § 2509.75-2(c) establishing that, irrespective of the plan-assets regulation, a plan investment in a partnership or corporation is a prohibited transaction if it was part of an arrangement or understanding designed to benefit, directly or indirectly, a fiduciary of the plan. That is clearly the situation here and taxpayers have not even attempted to show error in the Tax Court's determination that Mr. Ellis intended to receive a financial benefit in causing his IRA to transfer all of its assets to CST.

Indeed, I.R.C. § 4975(c)(1) expressly provides that a prohibited transaction means "any direct or *indirect*—(D) transfer to, or use by or

11568703.1

for the benefit of, a disqualified person of the income or assets of a plan; . . . [or] (E) act by . . . a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account [emphasis added]." Since a prohibited transaction includes any "indirect" transfer or self-dealing, taxpayers are wrong in asserting (Br. 12, 13, 18-19, 23) that only a disqualified person's direct transaction with assets of the plan is prohibited. *See* H. Conf. Rept. No. 93-1280 (1974), 1974-3 C.B. 415, 469 ("prohibited transaction may occur even though there has not been a transfer of money or property between the plan and a party-in-interest"). *Accord Keystone Consol. Indus.*, 508 U.S. at 159 (emphasizing that for purposes of construing term "sale or exchange" in § 4975(c)(1)(A), which prohibits transfer of property between plan and disqualified person, word "indirect" must be given meaning).

Here, Mr. Ellis, through his self-directed investment of nearly all of his IRA in CST, arranged for his own right to receive compensation as the company's general manager and for his effective majority control of the company. CST in fact paid him compensation for his services in both 2005 and 2006. Plainly, this was an "indirect" use by Mr. Ellis of assets of the plan and amounted to his self-dealing with assets of the

plan for his own account. *See Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209, 1214-20 (2d Cir. 1987) (compensation in form of commissions paid to plan fiduciary from an entity in which plan was invested held prohibited transaction); *Peek v. Commissioner,* 140 T.C. 216, 224-25 (2013) (plan fiduciary's personal guaranty of loan by company in which plan invested held an indirect extension of credit to plan and thus a prohibited transaction); *O'Malley v. Commissioner*, 96 T.C . 644, 651 (1991), *aff'd*, 972 F.2d 150 (7th Cir. 1992) ("While petitioner may not have acted as a representative or on behalf of the Pension Plan by approving the payment of his fees, he nonetheless participated in the transaction, for purposes of section 4975, by being the recipient of the benefit bestowed by the transaction."); *Rollins v. Commissioner*, T.C. Memo. 2004-260, 2004 WL 2580602, *10-11 (U.S. Tax Ct. 2004) (holding that a prohibited transaction occurred when loans were made to entities in which a disqualified person held an interest despite the fact that no plan assets were directly transferred to him).

### 3. Taxpayers' reliance on the Tax Court's decisions in *Swanson* and *Hellweg* is misplaced

In support of their contention that a prohibited transaction did not occur when Mr. Ellis's IRA invested in CST or when CST paid compensation to Mr. Ellis, taxpayers (Br. 1, 17, 19-24) rely heavily on *Swanson v. Commissioner*, 106 T.C. 76 (1996) and *Hellweg v. Commissioner*, T.C. Memo. 2011-58, 2011 WL 821090 (U.S. Tax Ct. 2011). The decisions in those cases are, however, inapposite.

In *Swanson*, IRAs owned by the taxpayer each acquired a 100-percent ownership interest in two companies which later paid dividends to the IRAs. At issue was whether the IRAs' investments in the two companies, and the companies' payments of dividends to the IRAs, were prohibited transactions. The Tax Court found in *Swanson* that, because the two companies had no shareholders when the IRAs invested in them, they were not disqualified persons under § 4975(e)(2)(G), and the investments did not, therefore, result in prohibited transactions under I.R.C. § 4975(c)(1)(A). 106 T.C. at 88-89. Unlike the instant case, the Commissioner did not show in *Swanson* that the investments by the IRAs were part of an arrangement through which the taxpayer, as a fiduciary of his IRA, expected to be paid a benefit in violation of I.R.C.

11568703.1

§ 4975(c)(1)(D) and (E).[12]  The Tax Court noted in *Swanson* in this

regard that the Commissioner "never suggested that [the taxpayer],

acting as a 'fiduciary' or otherwise, ever dealt with the *corpus* of [the

IRAs] for his own benefit."  106 T.C. at 89.

On the dividend-payment issue, the *Swanson* court found that the

dividend payments to the IRAs were not prohibited transactions

because any benefit they provided to the taxpayer was attributable

solely to his status as a participant of his IRA.  106 T.C. at 89-90.  In

---

[12] Based on *Swanson,* the Tax Court determined in this case that
CST likewise was not a disqualified person at the time Mr. Ellis's IRA
acquired an equity interest in it, and, because the transaction was thus
not between a plan and a disqualified person, no prohibited transaction
occurred at that time.  (A. 521-522.)  As already shown, however, the
investment by the IRA in CST was nevertheless part of an arrangement
under which it was expected that future benefits would be paid to
Mr. Ellis by CST.  Thus, under the DOL's Interpretive Bulletin 75-2,
29 C.F.R. § 2509.75-2(c), the investment arrangement is deemed a
prohibited transaction under I.R.C. § 4975(c)(1)(D) and (E), because it
was an indirect form of self-dealing between Mr. Ellis and his IRA.

Moreover, although CST did not meet the definition of a
disqualified person at the time Mr. Ellis's IRA first acquired an interest
in CST in June 2005, it then became one as soon as the interest was
acquired, because Mr. Ellis, a fiduciary of his IRA, was deemed to own a
constructive beneficial interest in CST exceeding 50-percent.  *See* I.R.C.
§ 4975(e)(2)(G), (e)(4) and I.R.C. § 267(c).  Thus, when the IRA acquired
a further interest in CST in August 2005, a prohibited transaction
occurred at that point of time between the IRA and a disqualified
person, *i.e.,* CST.

contrast, the instant case does not involve payments by CST to Mr. Ellis's IRA. Rather, the payments in issue were made directly to Mr. Ellis to compensate him for services he provided to CST as general manager of CST's used car business; such payments were wholly unrelated to Mr. Ellis's status as a participant of his IRA. *Swanson* thus does nothing to advance taxpayer's case herein.[13]

The Tax Court's memorandum opinion in *Hellweg* is also inapposite to this case. In that case, the taxpayers, a number of Roth IRA owners, had a controlling interest in an S corporation that manufactured pet food ingredients. 2011 WL 821090, at *2. The taxpayers formed a domestic international sales corporation (DISC) in which all of the stock was acquired by their Roth IRAs. *Ibid.* The S corporation paid the DISC commissions under a commission agreement. *Ibid.* The Commissioner determined that those commissions were, in substance, earnings distributions to the taxpayers that they, in turn, contributed their Roth IRAs. *Id.*, at *3. The question

---

[13] For the same reasons, taxpayers' reliance on IRS Field Service Advisory 200128011 (Br. 17, 27), a non-precedential document (*see* I.R.C. § 6110(k)(3)), is misplaced.

raised was whether the arrangement thus resulted in excess contributions to the Roth IRAs, thus triggering the imposition of an excise tax under I.R.C. § 4973. *Ibid.*

The Tax Court held that the taxpayers in *Hellweg* were not liable for the excise tax on excess contributions. 2011 WL 821090, at *12. In ruling on that question, it considered whether a prohibited transaction had occurred under I.R.C. § 4975(c)(1). *Id.*, *10-11. Applying the reasoning of its decision in *Swanson*, the Tax Court found that the DISC was not a disqualified person when its stock was acquired by the Roth IRAs, and that the increased value in the IRAs arising from the commission payments were merely attributable each taxpayer's status as a participant of his IRA. *Ibid.* As in *Swanson, Hellweg,* unlike this case, did not involve an arrangement intended to circumvent the prohibited transactions rule of I.R.C. § 4975(c)(1).

### 4. The exemptions in I.R.C. § 4975(d)(2) and (d)(10) are inapplicable to this case

Taxpayers' claim (Br. 24-27) that I.R.C. §§ 4975(d)(2) and (10) exempt the payment of wages and rent here fails for three reasons. First, the payments are for services or property provided to CST, and to not to the IRA plan. Second, the payments were not "reasonable."

Third, these exemptions can apply only to the prohibited transactions described in § 4975(c)(A) through (D) and not to self-dealing transactions under § 4975(c)(1)(E). Section 4975(d)(2) exempts "any contract, or reasonable arrangement, made with a disqualified person for office space, or legal, accounting or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefore." Taxpayers argue that this exempts the rental payments made by CST during 2006 to lease the Harrisonville property from CDJ. They also contend that I.R.C. § 4975(d)(10) exempts Mr. Ellis's wages from CST. That section exempts "the receipt by a disqualified person of any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan."

By their express terms, these exemptions cover payments made for services "necessary for establishment or operation *of the plan*" (§ 4975(d)(2) (emphasis added)) or in performance of "duties *with the plan*" (§ 4975(d)(10) (emphasis added)). They do "not exempt the fees and other compensation . . . received from companies in which the Plans' assets are invested." *Lowen*, 829 F.2d at 1216 & n. 4; *see also*

11568703.1

*National Sec. Systems, Inc. v. Iola,* 700 F.3d 65, 95 (3d Cir. 2012);

*Harris Trust and Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302

F.3d 18, 33 (2d Cir. 2002). The Tax Court thus correctly rejected (A.

524-525) taxpayers' argument that the compensation paid to Mr. Ellis

by CST was exempt under § 4975(d)(10), inasmuch as that exemption

applies only to compensation for services rendered in administering or

managing *the plan*, and not to compensation paid to a fiduciary and

disqualified person for services rendered in carrying on a used car

business in which the Plan invested all of its assets.

The Tax Court did not discuss the reasonableness of the 2006

rental payments made by CST, since it held that a prohibited

transaction had occurred in 2005. In any event, the reasonableness of

those payments was likewise irrelevant, because the record is clear that

those payments were not made for the lease of space "necessary for the

establishment or operation of *the plan* (emphasis added)," but were

made for a lease of space for a used car business. Thus, the exemption

at § 4975(d)(2) was also inapplicable.

Taxpayers (Br. 26-27) cite 29 C.F.R. § 2550.408c-2 and DOL

Opinion Letter No. 83-45A as supporting their position that the

exemptions at I.R.C. § 4975(d)(2) and (d)(10) apply in this case. Their reliance on 29 C.F.R. § 2550.408c-2 is misplaced, since it expressly states that the exemption for reasonable compensation applies only to compensation paid "for services rendered to the plan." 29 C.F.R. §2550.408c-2(a). As the Tax Court held here, the compensation paid to Mr. Ellis did not fall within that exempt category, because it was paid for services he rendered to the used car business operated by CST and not for services he rendered to his IRA.

Taxpayers' reliance on Opinion Letter No. 83-45A is also misguided. There, the DOL responded to an inquiry from a company offering its employees an ERISA benefit plan. As relevant, the DOL addressed whether services provided by a party in interest (a company subsidiary) to maintain and repair plan investment properties satisfy the exemption requirement that they be "services necessary for the establishment or operation of the plan." The DOL observed that an exemption might apply, but it declined to rule on that point, noting that the issue is "inherently factual in nature." Opinion Letter No. 83-45A, pp. 3-4 (citing ERISA, § 408(b)(2), the counterpart to I.R.C. § 4975(d)(2)).

11568703.1

In sum, I.R.C. § 4975(d)(2) and (10) do not exempt the payments of rent and employee compensation in issue because they were not made for services needed to  administer Mr. Ellis's IRA.

In addition, these provisions exempt only "reasonable" compensation or rent.  Whether a payment is reasonable "depends on the particular facts and circumstances of each case."  29 C.F.R. §2550.408c-2(b)(1). The payments to Mr. Ellis and to CDJ were made as part of an arrangement or understanding that the IRA's assets would be used to invest in a third party that would in turn pay Mr. Ellis and his family company wages and rent.  These payments – in fact this whole arrangement – was unreasonable and illegal from the onset.  Payments made as part of a self-dealing arrangement are never reasonable.

Finally, even if the payments had met the language of I.R.C. § 4975(d)(2) and (10), at best, they would be exempt from violations of § 4975(c)(1)(A) through (D) only.  Department of Labor regulations make clear that these provisions do not exempt a fiduciary's use of plan assets in his own interest or for his own account under § 4975(c)(1)(E). *See* 29 C.F.R. § 2550.408b-2(b)("section408(b)(2) [counterpart to I.R.C. § 4975(d)(2)] does not contain an exemption from acts described in

section 406(b)(1) [counterpart to I.R.C. § 4975(c)(1)(E)]"); *see also*

29 C.F.R. §2550.408c-2(a)(ERISA § 408(c)(2) [counterpart to I.R.C.

§ 4975(d)(10)] clarifies what constitutes "reasonable compensation"

under ERISA § 408(b)(2) [counterpart to I.R.C. § 4975(d)(2)]).  In short,

there is no exemption for fiduciary self-dealing. [14]

---

[14] Taxpayers concede (Br. 12-13), as the Commissioner and the Tax Court determined, that, if a prohibited transaction occurred, Mr. Ellis's IRA ceased to be a plan exempt from tax as of the first day of the year in which the transaction occurred, and the Plan's assets are deemed fully distributed to Mr. Ellis on that date, and are includible in taxpayers' gross income for that year.  *See* I.R.C. § 408(e)(1) and (2). Moreover, taxpayers do not contest in their brief on appeal, that, if a prohibited transaction occurred, they are liable under I.R.C. § 72(t) for a 10-percent additional tax on that early IRA distribution.  Nor do they dispute that, if the Tax Court's decision on the merits is affirmed by this Court, they are liable for the accuracy-related penalty imposed by the Commissioner under I.R.C. § 6662.  They have thus waived these issues.  *See, e.g., Halabi v. Ashcroft,* 316 F.3d 807, 808 (8th Cir. 2003).

## CONCLUSION

For the foregoing reasons, the decision of the Tax Court is correct and should be affirmed.

      Respectfully submitted,

      TAMARA W. ASHFORD
       *Acting Assistant Attorney General*

      /s/ John A. Nolet

      RICHARD FARBER      (202) 514-2959
      JOHN A. NOLET      (202) 514-2935
       *Attorneys*
       *Tax Division*
       *Department of Justice*
       *Post Office Box 502*
       *Washington, D.C. 20044*

JUNE 2014

## CERTIFICATE OF COMPLIANCE

### With Type-Volume Limitation, Typeface, Type Style, and Virus Scanning Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[X]   this brief contains __**11,031**__ words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ]   this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X]   this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook, *or*

[ ]   this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

3.  Pursuant to Eighth Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses using Trend Micro Office Scan, which reports that the file is virus-free.

(s) __/s/ John A. Nolet_____
Attorney for the Commissioner of Internal Revenue_____
Dated: ___June 23, 2014_____

11568703.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of June, 2014, I electronically filed a PDF version of the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

_____/s/ John A. Nolet_____

JOHN A. NOLET

*Attorney*

11568703.1